**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

Plaintiff,

v.

Civil Action No. ______

ENVIRONMENTAL RESOURCE HOLDINGS, LLC,

Defendant.

**CONSENT DECREE FOR DIAMOND ALKALI OPERABLE UNITS 2 AND 4: CONSTRUCTION OF UPLAND PROCESSING FACILITY, CONSTRUCTION OF UPLAND SUPPORT FACILITIES, AND OPERABLE UNIT 2 BASELINE SAMPLING**

# TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION AND VENUE | 6 |
| III. | PARTIES BOUND | 6 |
| IV. | DEFINITIONS | 7 |
| V. | OBJECTIVES | 11 |
| VI. | PERFORMANCE OF THE WORK | 11 |
| VII. | PROPERTY REQUIREMENTS | 13 |
| VIII. | FINANCIAL ASSURANCE | 14 |
| IX. | INDEMNIFICATION AND INSURANCE | 18 |
| X. | PAYMENTS FOR RESPONSE COSTS | 19 |
| XI. | FORCE MAJEURE | 20 |
| XII. | DISPUTE RESOLUTION | 21 |
| XIII. | STIPULATED PENALTIES | 22 |
| XIV. | COVENANTS BY PLAINTIFF | 24 |
| XV. | PRIOR ADMINISTRATIVE ORDERS | 26 |
| XVI. | COVENANTS BY SETTLING DEFENDANT | 26 |
| XVII. | EFFECT OF SETTLEMENT; CONTRIBUTION | 26 |
| XVIII. | CERTIFICATION | 27 |
| XIX. | RECORDS | 28 |
| XX. | NOTICES AND SUBMISSIONS | 30 |
| XXI. | APPENDIXES | 30 |
| XXII. | MODIFICATIONS TO DECREE | 31 |
| XXIII. | SIGNATORIES | 31 |
| XXIV. | PRE-ENTRY PROVISIONS | 31 |
| XXV. | INTEGRATION | 31 |
| XXVI. | FINAL JUDGMENT | 31 |

# I. BACKGROUND

1. The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter under section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9606, related to Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the Diamond Alkali Superfund Site in Essex, Hudson, Bergen and Passaic Counties, New Jersey ("Site").

2. The United States asserts a claim that Defendant is liable under section 106 of CERCLA for releases and threatened releases of hazardous substances at and from OU2 and OU4 of the Site.

3. The United States seeks performance of the "Work," as defined in Section IV (Definitions) below, by Settling Defendant, as defined in Section IV (Definitions) below, consistent with the National Contingency Plan, 40 C.F.R. part 300 ("NCP").

4. In accordance with the NCP and section 121(f)(1)(F) of CERCLA, EPA notified the State of New Jersey ("State") on November 13, 2024, of negotiations with a potentially responsible party ("PRP") regarding the implementation of the remedial action for OU2 and for OU4 of the Site, and EPA has provided the State with an opportunity to participate in such negotiations and to be a party to this Consent Decree ("Decree").

5. In accordance with section 122(j)(1) of CERCLA, EPA notified the Department of the Interior, Fish and Wildlife Service, and the Department of Commerce, National Oceanic and Atmospheric Administration, on November 13, 2024, of negotiations with a PRP regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship.

6. The defendant that has entered into this Decree ("Settling Defendant") does not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor does it acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

7. In accordance with section 105 of CERCLA, EPA listed the Site on the National Priorities List ("NPL"), set forth at 40 C.F.R. part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37,070.

8. The Site includes the former Diamond Alkali property located at 80 and 120 Lister Avenue in Newark, New Jersey, ("OU1"), as well as the 17-mile Lower Passaic River Study Area ("LPRSA" or "OU4"), which includes the lower 8.3 miles of the LPRSA ("OU2"), and the Newark Bay Study Area, ("OU3"), and the areal extent of contamination.

9. Production of dichlorodiphenyl-trichloroethane ("DDT") and other chemical products began at 80 Lister Avenue ("Lister Avenue Facility"), Newark, New Jersey in the 1940s by Kolker Chemical Works, Inc. ("Kolker Chemical"). In 1951, the Diamond Alkali Company purchased the stock of Kolker Chemical. Between March 1951 and August 1969, the Diamond

Alkali Company operated the Lister Avenue Facility in Newark, New Jersey, where it produced, among other products, DDT, 2,4,5-trichlorophenol (“2,4,5-TCP”), and 2,4,5-trichlorophenoxy acetic acid (“2,4,5-T”). A byproduct of the manufacturing process was 2,3,7,8-tetrachloro-dibenzo-p-dioxin (“2,3,7,8-TCDD”), which was released into the Passaic River. Production activities at the Lister Avenue Facility ceased in August 1969. In 1971, Diamond Shamrock Corporation sold the plant and property to Chemicaland Corporation, which conducted certain chemical manufacturing activities for itself and others during the several years it owned and occupied the 80 Lister Avenue property.

10. In 1967, the Diamond Alkali Company changed its name to the Diamond Shamrock Corporation. In 1983, the Diamond Shamrock Corporation changed its name to the Diamond Shamrock Chemicals Company. On September 4, 1986, all outstanding stock in the Diamond Shamrock Chemicals Company was acquired by the Oxy-Diamond Alkali Corporation from Maxus Energy Corporation, and the Diamond Shamrock Chemicals Company name was changed to the Occidental Electrochemicals Corporation. On November 30, 1987, the Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation, a New York Corporation (“OCC-NY”). In September 2025, OCC-NY was merged into a newly formed Texas company named Snowcone, LLC, which changed its name to Occidental Chemical Company LLC (“OCC LLC”). OCC LLC then undertook a “divisional” merger under Texas law, Tex. Bus. Orgs. Code Ann.§ 1.002(55), resulting in a surviving entity renamed Environmental Resource Holdings, LLC (“ERH” or “Settling Defendant”), and a new entity, Occidental Chemical Corporation, a Texas Corporation. ERH has represented it retained the legacy environmental liabilities of OCC-NY.

11. The Diamond Alkali Company disposed of chemical waste, including hazardous substances, during its ownership and operation of the Lister Avenue Facility, located in Newark, Essex County, New Jersey. The Diamond Alkali Company also disposed of chemical waste, including hazardous substances, in the LPRSA, which is part of the Site. EPA first notified OCC-NY, a corporate successor to the Diamond Alkali Company, of its liability for the Site on October 20, 1988.

12. Pursuant to Administrative Orders on Consent with the New Jersey Department of Environmental Protection (“NJDEP”), the Diamond Shamrock Chemicals Company conducted investigations and response work for the Lister Avenue Facility. The investigation included the sampling and assessment of sediment contamination within the Passaic River.

13. Sampling and assessment of sediments in the LPRSA has revealed the presence of dioxin and other hazardous substances including, but not limited to, polychlorinated biphenyls (“PCBs”), polycyclic aromatic hydrocarbons (“PAHs”), dichlorodiphenyl-trichloroethane (“DDT”) (and its breakdown products), dieldrin, mercury, copper, and lead. EPA has identified and sent general notice letters to over 100 potentially responsible parties for the LPRSA under section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

14. Some of the chemicals found in the sediments during the remedial investigation of the Lower Passaic River were released from the Lister Avenue Facility into the Passaic River through direct discharges and groundwater and surface-water runoff.

15. On September 30, 1987, EPA issued a Record of Decision setting forth an interim remedy for OU1 ("OU1 ROD"). Pursuant to a judicial consent decree entered in 1990 with the United States and NJDEP, OCC-NY and Chemical Land Holdings, Inc. (subsequently known as Tierra Solutions, Inc. ("Tierra")) agreed to implement the interim remedy. *United States, et al. v. Occidental Chemical Corporation, et al.*, Civil Action. No. 89-5064 (D.N.J.). The interim remedy selected in the OU1 ROD consisted of demolishing a warehouse and other structures on the property; capping contaminated soils and material; installing subsurface slurry walls on three sides of the property and a sheet-pile flood wall along the river; and constructing and operating a groundwater collection and treatment system. Construction of the interim remedy was completed in 2001.

16. In 1994, OCC-NY entered into an Administrative Order on Consent with EPA to investigate a six-mile stretch of the Lower Passaic River. The primary objectives of the investigation were to determine: (1) the spatial distribution and concentration of hazardous substances, both horizontally and vertically, in the sediments; (2) the primary human and ecological receptors of contaminated sediments; and (3) the transport of contaminated sediment. Tierra performed the work on OCC-NY's behalf, under the oversight of EPA. Tierra owned the 80 and 120 Lister Avenue portion of the Site from 1986 until it filed for bankruptcy in 2016. In or about 2017, title to the property was transferred to Mariana Properties, Inc., which at the time was an affiliate of OCC-NY and is currently an affiliate of ERH.

17. Sampling results from the investigation of the six-mile stretch and other environmental studies demonstrated that a more comprehensive evaluation of a larger area was necessary because sediments contaminated with hazardous substances are present throughout the six-mile stretch of the River. Further, the tidal nature of the Lower Passaic River had resulted in greater dispersion of hazardous substances into and out of the six-mile stretch.

18. EPA commenced a remedial investigation and feasibility study ("RI/FS") in 2002 for the 17-mile LPRSA pursuant to 40 C.F.R. § 300.430. In 2007, a number of potentially responsible parties ("PRPs"), identified as the Cooperating Parties Group ("CPG"), agreed to take over performance of the 17-mile LPRSA RI/FS. Having determined that the majority of the contaminated sediment in the LPRSA is found in the lower 8.3 miles of the Passaic River, EPA performed a RI and focused feasibility study ("FFS") to evaluate taking action to address contaminated sediments in the lower 8.3 miles of river while the 17-mile LPRSA RI/FS was underway.

19. In 2004, EPA and OCC-NY entered into an Administrative Order on Consent pursuant to which OCC-NY agreed to perform the RI/FS for OU3, Newark Bay, under the oversight of EPA. Tierra performed the RI/FS for Newark Bay on OCC-NY's behalf until it filed for bankruptcy in 2016. The study of Newark Bay is ongoing. Glenn Springs Holdings, Inc. ("Glenn Springs") has been performing the Newark Bay RI/FS work on behalf of OCC-NY. Recently, Glenn Springs has indicated that it is performing the work on behalf of ERH.

20. In June 2008, EPA, OCC-NY, and Tierra signed an Administrative Settlement Agreement and Order on Consent for a non-time-critical removal action to remove 200,000 cubic yards of contaminated sediment from the river (from RM3.0 to RM3.8) adjacent to the 80-120 Lister Avenue facility (the "Tierra Removal ASAOC"). Phase I, removal of 40,000 cubic yards,

was completed in 2012. The Phase II area was integrated into the OU2 Remedial Design and will be remediated in a manner consistent with the rest of OU2.

21. In 2011, OCC-NY entered into an Administrative Settlement Agreement and Order on Consent with EPA to sample combined sewer outfalls and stormwater outfalls discharging to the Passaic River. In 2017, EPA issued a notice of completion of the Administrative Order on Consent, subject to continuing obligations, as set forth in Section XIV of the Order.

22. In June 2012, EPA and certain members of the CPG entered into a settlement agreement to remove approximately two feet of sediment from the eastern bank of the Passaic River at River Mile 10.9 and cap that area ("River Mile 10.9 ASAOC"). In that same period, EPA issued a Unilateral Administrative Order for Removal Response Activities to OCC-NY ("River Mile 10.9 Removal UAO"), which required OCC-NY to perform certain activities at River Mile 10.9 and to cooperate with the signatories of the River Mile 10.9 ASAOC. OCC-NY has performed a number of tasks under the River Mile 10.9 Removal UAO, as directed by EPA. EPA has agreed to issue a notice of completion of the River Mile 10.9 ASAOC, should the consent decree lodged in *United States of America, Plaintiff v. Alden Leeds, Inc., et al., Defendants, Passaic Valley Sewerage Commissioners, et al., Intervenors*, No. 22-cv-7326-MCA-LDW (D.N.J.) be entered and subject to continuing obligations, as set forth in Section VIII (Prior Administrative Orders) of that consent decree.

23. In accordance with section 117 of CERCLA and 40 C.F.R § 300.430(f), EPA published notice of the completion of the RI/FFS and of the proposed plan for remedial action for OU2 on its website on April 11, 2014, and in a major local newspaper of general circulation on April 25, 2014. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting and comments received are available to the public as part of the administrative record upon which the Director of the Emergency and Remedial Response Division, EPA Region 2 based the selection of the response action.

24. EPA selected a remedial action for OU2, which is embodied in the Record of Decision ("OU2 ROD") issued on March 3, 2016, on which the State had a reasonable opportunity to review and comment and on which the State has given its concurrence. The OU2 ROD includes a summary of responses to the public comments. Notice of the final plan was published in accordance with section 117(b) of CERCLA.

25. The OU2 remedy includes, but is not limited to the following: 1) construction of an engineered cap over the river bottom of the lower 8.3 miles of the LPRSA bank to bank; 2) dredging of the river so the cap can be placed without increasing the potential for flooding and to allow for the continued use of the federally-authorized navigation channel in the 1.7 miles of the river closest to Newark Bay; 3) reconstructing dredged mudflat areas and restoring mudflat habitat; 4) dewatering at an upland processing facility ("UPF") and off-site disposal of dredged material; 5) institutional controls to protect the cap and enhanced outreach to increase awareness of the New Jersey Department of Environmental Protection's prohibitions on fish and crab consumption; and 6) long term monitoring and maintenance. The estimated cost of the remedy

provided in the OU2 ROD is $1.38 billion. Implementation of the OU2 remedy requires construction of one or more Upland Support Facilities ("USFs"), as well as baseline sampling.

26. On September 30, 2016, EPA and OCC-NY entered into Administrative Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-2021 ("2016 RD ASAOC"), pursuant to which OCC-NY has performed, under EPA oversight, the remedial design for the remedial action selected in the OU2 ROD. On May 6, 2024, EPA approved the final remedial design and on June 13, 2024, EPA issued a notice of completion of the 2016 RD ASAOC subject to continuing obligations such as payment of certain future response costs (as defined therein) and document retention.

27. On April 14, 2021, in accordance with section 117 of CERCLA and 40 C.F.R § 300.430(f), EPA published, in a major local newspaper of general circulation, a notice of proposed plan for an interim remedy to address contaminated sediments in the upper 9 miles of OU4. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting and comments received are available to the public as part of the administrative record upon which the EPA Administrator based the selection of the response action.

28. EPA selected an interim remedy for OU4, which is embodied in a Record of Decision ("OU4 ROD") issued on September 28, 2021, on which the State had a reasonable opportunity to review and comment and on which the State has given its concurrence. The OU4 ROD includes a summary of responses to the public comments. Notice of the final plan was published in accordance with section 117(b) of CERCLA.

29. The interim remedy for OU4 consists of dredging and capping to control sediment sources of 2,3,7,8-TCDD and PCBs by remediating surface sediments with elevated concentrations of those hazardous substances and controlling subsurface sediments that might be exposed due to erosion. The other COCs in the upper 9 miles, as identified by the risk assessments performed for the LPRSA, are total DDx, other dioxins/furans, dieldrin, copper, lead, mercury (including methyl mercury), and PAHs. Contaminants other than 2,3,7,8-TCDD and total PCBs will be addressed during the IR to the extent they are collocated with areas targeted for remediation based on concentrations of 2,3,7,8-TCDD and total PCBs, or will be addressed in the final remedy, as needed. The estimated cost of the interim remedy provided in the OU4 ROD is $441 million. The OU4 ROD provides that facility capacity and accessibility evaluations will be conducted during the remedial design to identify locations for sediment processing, including the sediment processing facility for the material dredged from the lower 8.3 miles, which is the UPF.

30. On March 2, 2023, EPA issued a Unilateral Administrative Order for Remedial Design, CERCLA Docket No. 02-2023-2011 ("2023 RD UAO"), to OCC-NY directing OCC-NY to perform the remedial design, under EPA oversight, for the interim remedy selected in the OU4 ROD. Glenn Springs had been performing the remedial design on behalf of OCC-NY. Recently, Glenn Springs has indicated that it is performing the work on behalf of ERH.

31. The remedial actions selected for OU2 and OU4 include the removal of sediment from the river and for dredged material to be barged or pumped to an UPF.

32. The OU2 Remedial Design identifies the PVSC Property, as defined in Section IV (Definitions) below, as the location for the construction and operation of the UPF, a USF, and a location for a fixed sampling station for the OU2 resuspension monitoring.

33. The OU2 Remedial Design identifies seven potential locations for USFs, including the PVSC Property, the PSE&G Harrison Property, and the Town of Harrison Property, as defined in Section IV (Definitions) below. The OU2 Remedial Design allows for modifications to the number and/or location of USFs subject to EPA approval.

34. On December 16, 2014, a Consent Judgment executed by NJDEP and OCC-NY was entered in *NJDEP v. Occidental Chemical Corporation, et al.*, Essex County Docket Number L9868-05, in New Jersey Superior Court, Law Division, Essex County, pursuant to which OCC-NY has agreed to pay certain cleanup and removal costs as stated in the Consent Judgment. The Consent Judgment is subject to the jurisdiction of the courts of the State of New Jersey.

35. Based on the information currently available, EPA has determined that the Work will be properly and promptly conducted by Settling Defendant if conducted in accordance with this Decree.

36. The Parties recognize, and the Court by entering this Decree finds, that this Decree has been negotiated by the Parties in good faith, that implementation of this Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Decree is fair, reasonable, in the public interest, and consistent with CERCLA.

NOW, THEREFORE, it is hereby **ORDERED** and **DECREED** as follows:

## II. JURISDICTION AND VENUE

37. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1345, and section 113(b) of CERCLA, and personal jurisdiction over the Parties. Venue lies in this District under section 113(b) of CERCLA and 28 U.S.C. §§ 1391(b), and 1395(a), because the Site is located in this judicial district. This Court retains jurisdiction over the subject matter of this action and over the Parties for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with this Decree. Settling Defendant may not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.

## III. PARTIES BOUND

38. This Decree is binding upon the United States and upon Settling Defendant and its successors. Unless the United States otherwise consents, (a) any change in ownership or corporate or other legal status of Settling Defendant, including any transfer of assets, or (b) any Transfer of the Site or any portion thereof, does not alter any of Settling Defendant's obligations under this Decree. Settling Defendant's responsibilities under this Decree cannot be assigned except under a modification executed in accordance with ¶ 102.

39. In any action to enforce this Decree, Settling Defendant may not raise as a defense the failure of any of its officers, directors, employees, agents, contractors, subcontractors, or any person representing Settling Defendant to take any action necessary to comply with this Decree. Settling Defendant shall provide notice of this Decree to each person representing Settling Defendant with respect to the Site or the Work. Settling Defendant shall provide notice of this Decree to each contractor performing any Work and shall ensure that notice of the Decree is provided to each subcontractor performing any Work.

## IV. DEFINITIONS

40. Terms not otherwise defined in this Settlement have the meanings assigned in CERCLA or in regulations promulgated under CERCLA. Whenever the terms set forth below are used in this Decree, the following definitions apply:

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Certification of Work Completion" means the Certification issued under ¶ 4.8 of the SOW.

"Consent Decree" or "Decree" means this consent decree, and all appendixes attached hereto (listed in Section XXI), and all deliverables incorporated into the Decree under the Statement of Work ("SOW"). If there is a conflict between a provision in Sections I through XXVI and a provision in any appendix, the provision in Sections I through XXVI controls.

"Day" or "day" means a calendar day. In computing any period under this Decree, the day of the event that triggers the period is not counted and, where the last day is not a working day, the period runs until the close of business of the next working day. "Working day" means any day other than a Saturday, Sunday, or federal or State holiday.

"DOJ" means the United States Department of Justice.

"Effective Date" means the date upon which the Court's approval of this Decree is recorded on its docket.

"EPA" means the United States Environmental Protection Agency.

"ERH" means Environmental Resource Holdings, LLC.

"Existing Contamination" shall mean any hazardous substances, pollutants or contaminants, present or existing on or under the PVSC Property or the PSE&G Harrison Property as of the date of signature of this Consent Decree by Settling Defendant, except that Existing Contamination does not include 2,3,7,8-TCDD that moved from the Lower Passaic River onto such Property(ies) as a result of natural forces.

"FDIC" means the Federal Deposit Insurance Corporation.

"Fund" means the Hazardous Substance Superfund established under section 9507 of the Internal Revenue Code, 26 I.R.C. § 9507.

"Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States: pays after the Effective Date in implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing and approving deliverables generated under this Decree; (ii) in overseeing Settling Defendant's performance of the Work; (iii) in assisting or taking action to obtain access or use restrictions under ¶ 47.e; (iv) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including any compensation paid; (v) in taking action under ¶ 54 (Access to Financial Assurance); (vi) in taking response action described in ¶ 82 because of Settling Defendant's failure to take emergency action under ¶ 4.4 of the SOW; (vii) in implementing a Work Takeover under ¶ 46; (viii) in implementing community involvement activities including the cost of any technical assistance grant provided under section 117(e) of CERCLA; and (ix) in enforcing this Decree, including all costs paid under Section XII (Dispute Resolution) and all litigation costs.

"Including" or "including" means "including but not limited to."

"Institutional Controls" means: (a) Proprietary Controls (*i.e.*, easements or covenants running with the land that (i) limit land, water, or other resource use, provide access rights, or both, and (ii) are created under common law or statutory law by an instrument that is recorded, or for which notice is recorded, in the appropriate land records office); and (b) state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (i) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (ii) limit land, water, or other resource use to implement, ensure noninterference with, or ensure the protectiveness of the OU2 Remedial Action and the OU4 Remedial Action; (iii) provide information intended to modify or guide human behavior at or in connection with the Site; or (iv) any combination thereof.

"Interest" means interest at the rate specified for interest on investments of the Fund, as provided under section 107(a) of CERCLA, compounded annually on October 1 of each year. The applicable rate of interest will be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. As of the date of lodging of this Decree, rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"Lister Avenue Facility" means the manufacturing facility located at 80 Lister Avenue in Newark, New Jersey and operated by the Diamond Alkali Company from March 1951 to August 1969, and before that, by Kolker Chemical.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated under section 105 of CERCLA, codified at 40 C.F.R. part 300, and any amendments thereto.

"OCC-NY" means Occidental Chemical Corporation, a New York Corporation (also sometimes referred to as OxyChem NY).

"OU1 ROD" means the EPA decision document that memorializes the selection of the interim remedial action relating to OU1 of the Site, signed by the Regional Administrator of EPA

Region 2 on September 30, 1987, and the EPA decision document that memorializes the selection of the final selected remedy relating to OU1 of the Site, signed by the Director of the Superfund & Emergency Management Division of EPA Region 2 on January 17, 2025, and all attachments thereto. The OU1 ROD documents can be found at https://semspub.epa.gov/src/document/02/83052 and https://semspub.epa.gov/work/02/747012.pdf.

"OU2 Remedial Action" means the remedial action selected in the OU2 ROD.

"OU2 Baseline Sampling" means (1) water column sampling before the start of dredging to support the dredging resuspension monitoring program; (2) air quality, odor and noise monitoring before the start of construction so that construction-related impacts can be detected in the environmental monitoring program to be implemented during remedial action construction; and (3) fish and crab tissue sampling before the start of dredging to support the long term observational monitoring to be implemented after OU2 remedial construction is completed.

"OU2 Remedial Design" means the reports approved by EPA on May 6, 2024, documenting the plans and specifications for implementing the OU2 Remedial Action.

"OU2 ROD" means the EPA decision document that memorializes the selection of the remedial action relating to OU2 of the Site, signed by the Director of the Emergency and Remedial Response Division of EPA Region 2 on March 3, 2016, and all attachments thereto. The OU2 ROD can be found at https://semspub.epa.gov/src/document/02/396055.pdf and the Decision Summary portion, without attachments, is attached as Appendix A.

"OU4 Remedial Action" means the interim remedial action selected in the OU4 ROD.

"OU4 Remedial Design" means the activities to develop plans and specifications for implementing the OU4 Remedial Action.

"OU4 ROD" means the EPA decision document that memorializes the selection of the interim remedial action relating to OU4 of the Site, signed by the Administrator of EPA on September 28, 2021, and all attachments thereto. The OU4 ROD can be found at https://semspub.epa.gov/work/02/630399.pdf, and the Decision Summary portion, without attachments, is attached as Appendix B.

"Paragraph" or "¶" means a portion of this Decree identified by an Arabic numeral or an upper- or lower-case letter.

"Parties" means the United States and Settling Defendant.

"Plaintiff" means the United States.

"PSE&G Harrison Property" means real property owned by the Public Service Electric and Gas Company located at Block 78, Lot 1.02 in the Town of Harrison, New Jersey that has been identified in the OU2 Remedial Design as a location to be used for the construction and operation of a USF.

"PVSC" means the Passaic Valley Sewerage Commission.

"PVSC Property" means real property owned by PVSC located at Block 5066, Lots 12, 12.01 and 16, in Newark, New Jersey that has been identified in the OU2 Remedial Design as the location to be used for the construction and operation of the UPF, a USF, and a fixed sampling station for the OU2 resuspension monitoring.

"RCRA" means the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k, (also known as the Resource Conservation and Recovery Act).

"RPM" means the EPA Remedial Project Manager.

"Scope of the Remedy" means the scope of the remedy set forth in ¶ 1.2 of the SOW.

"Section" means a portion of this Decree identified by a Roman numeral.

"Settling Defendant" means ERH.

"Site" means the Diamond Alkali Superfund Site, including the Lister Avenue Facility, and the adjacent property at 120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area, the Newark Bay Study Area, and the areal extent of contamination.

"Special Account" means the special account, within the Fund, established for the Site by EPA under section 122(b)(3) of CERCLA.

"State" means the State of New Jersey.

"Statement of Work" or "SOW" means the document attached as Appendix C, which describes the activities Settling Defendant must perform to construct and maintain the effectiveness of the UPF and USF(s), and implement the OU2 Baseline Sampling components of the OU2 and OU4 Remedial Actions.

"Town of Harrison Property" means the property located at 1 New Jersey Railroad Avenue, Town of Harrison, New Jersey, that has been identified in the OU2 Remedial Design as a location to be used for the construction and operation of a USF.

"Transfer" means to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"Upland Processing Facility" or "UPF" shall mean the processing facility described variously in the OU2 ROD as the upland processing facility or upland sediment processing facility necessary to implement the remedy selected for OU2, and that could also be used for OU4, and that is to be constructed upon PVSC Property.

"Upland Support Facility" or "USF" shall mean a parcel of land and associated infrastructure that is needed to support the in-water construction of the OU2 Remedial Action

and OU4 Remedial Action. The OU2 Remedial Design allows for modifications to the number and/or location of USFs subject to EPA approval.

"United States" means the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" means (a) any "hazardous substance" under section 101(14) of CERCLA; (b) any pollutant or contaminant under section 101(33) of CERCLA; (c) any "solid waste" under section 1004(27) of RCRA; and (d) any mixture containing any of the constituents noted in (a), (b) or (c) above.

"Work" means all obligations of Settling Defendant under Sections VI (Performance of the Work) through IX (Indemnification and Insurance).

"Work Takeover" means EPA's assumption of the performance of any of the Work in accordance with ¶ 46.

## V. OBJECTIVES

41. The objectives of the Parties in entering into this Decree are to protect public health and welfare and the environment through the implementation and maintenance of a response action at the Site by Settling Defendant, to pay response costs of Plaintiff and to resolve and settle the claims of Plaintiff against Settling Defendant for performance of the Work and payment of Future Response Costs as provided in this Decree.

## VI. PERFORMANCE OF THE WORK

42. Settling Defendant shall finance, develop, construct, maintain, and monitor the effectiveness of the UPF, USF(s), and implement the OU2 Baseline Sampling components of the Remedial Action all in accordance with the SOW, any modified SOW and all EPA-approved, conditionally approved, or modified deliverables as required by the SOW or modified SOW.

43. Nothing in this Decree and no EPA approval of any deliverable required under this Decree constitutes a warranty or representation by EPA that completion of the Work will ensure that the UPF, USFs, and OU2 Baseline Sampling data will effectively implement the relevant elements of the remedies set forth in the OU2 ROD and OU4 ROD.

44. **Modifications to the Remedial Action and Further Response Actions**

a. Nothing in this Decree limits EPA's authority to modify the OU2 Remedial Action or the OU4 Remedial Action or to select further response actions for the Site in accordance with the requirements of CERCLA and the NCP. Nothing in this Decree limits Settling Defendant's rights, under sections 113(k)(2) or 117 of CERCLA, to comment on any modified or further response actions proposed by EPA.

b. If EPA modifies the OU2 Remedial Action or the OU4 Remedial Action in order to ensure that the UPF, USFs and OU2 Baseline Sampling data will effectively implement the relevant elements of the OU2 Remedial Action and the OU4 Remedial Action,

and such modification is consistent with the Scope of the Remedy and necessitates a modification to the Work, then, upon receipt of notice from EPA and subject to their right to initiate dispute resolution under Section XII within 30 days, Settling Defendant shall implement the modification to the Work as provided in ¶ 44.c.

c. Settling Defendant shall implement the modified Work necessitated by the OU2 Remedial Action modification and/or OU4 Remedial Action modification subject to its right to initiate dispute resolution. Settling Defendant shall modify the SOW, or related work plans, or both in accordance with the OU2 Remedial Action modification, OU4 Remedial Action modification or final resolution of the dispute, whichever applies. The OU2 Remedial Action modification or the OU4 Remedial Action modification, the approved modified SOW, and any related work plans will be deemed to be incorporated into and enforceable under this Decree.

d. Notwithstanding any other provision in ¶ 44, any modification to implement an amendment to the OU2 ROD or OU4 ROD that "fundamentally alters the basic features" of the OU2 Remedial Action or the OU4 Remedial Action within the meaning of 40 C.F.R. § 300.435(c)(2)(ii) shall be considered a material modification under, and may only be implemented in accordance with, ¶ 102.

45. **Compliance with Applicable Law**. Nothing in this Decree affects Settling Defendant's obligations to comply with all applicable federal and state laws and regulations. Settling Defendant must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the OU2 ROD, OU4 ROD, and the SOW. The activities conducted in accordance with this Decree, if approved by EPA, will be deemed to be consistent with the NCP as provided under section 300.700(c)(3)(ii).

46. **Work Takeover**

a. If EPA determines that Settling Defendant: (i) has ceased to perform any of the Work required under this Section; (ii) is seriously or repeatedly deficient or late in performing the Work required under this Section; or (iii) is performing the Work required under this Section in a manner that may cause an endangerment to public health or welfare or the environment, EPA may issue a notice of Work Takeover to Settling Defendant, including a description of the grounds for the notice and a period of time ("Remedy Period") within which Settling Defendant must remedy the circumstances giving rise to the notice. The Remedy Period will be 30 days, unless EPA determines in its unreviewable discretion that there may be an endangerment, in which case the Remedy Period will be 15 days.

b. If, by the end of the Remedy Period, Settling Defendant does not remedy to EPA's satisfaction the circumstances giving rise to the notice of Work Takeover, EPA may notify Settling Defendant and, as it deems necessary, commence a Work Takeover.

c. EPA may conduct the Work Takeover during the pendency of any dispute under Section XII but shall terminate the Work Takeover if: (i) Settling Defendant remedies, to EPA's satisfaction, the circumstances giving rise to the notice of Work Takeover; or (ii) upon the issuance of a final determination under Section XII (Dispute Resolution) that EPA is required to terminate the Work Takeover.

## VII. PROPERTY REQUIREMENTS

47. **Agreements Regarding Access and Noninterference**

a. As used in this Section, "Affected Property" means any real property, including the Site, where EPA determines, at any time, that access; land, water, or other resource use restrictions; Institutional Controls; or any combination thereof, are needed to implement the Work.

b. Settling Defendant shall use best efforts to secure from the owner(s) of all Affected Property an agreement, enforceable by Settling Defendant and by Plaintiff, requiring such owner to provide Plaintiff and Settling Defendant, and their respective representatives, contractors, and subcontractors with access at all reasonable times to such owner's property to conduct any activity regarding the Decree, including the following:

(1) implementing the Work and overseeing compliance with the Decree;

(2) conducting investigations of contamination at or near the Site;

(3) assessing the need for, planning, or implementing additional response actions at or near the Site;

(4) determining whether the Site is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Decree; and

(5) implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

c. Further, each agreement required under ¶ 47.b must commit the owner to refrain from using its property in any manner that EPA determines will pose an unacceptable risk to public health or welfare or the environment as a result of exposure to Waste Material, or will interfere with or adversely affect the implementation, integrity, or protectiveness of the OU2 Remedial Action or the OU4 Remedial Action, including the following:

(1) engaging in activities that could interfere with the OU2 Remedial Action or the OU4 Remedial Action;

(2) engaging in the activities that could result in human exposure to contaminants in soils and groundwater;

(3) constructing new structures that may interfere with the OU2 Remedial Action or the OU4 Remedial Action; and

(4) constructing new structures that may cause an increased risk of inhalation of contaminants.

d. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Defendant would use to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements. For purposes of this Paragraph, a "reasonable sum of money" is an amount of consideration which, taking into account the possible transaction costs (including, but not limited to, appraisal costs, attorneys fees, court costs, and consultant/expert witness fees), would likely be incurred in obtaining the rights in question by judicial or other means, is not significantly out of proportion with the fair market value of the rights to be obtained.

e. Settling Defendant shall provide to EPA a copy of each agreement required under ¶ 47.b. If Settling Defendant cannot accomplish what is required through best efforts in a timely manner, it shall notify EPA, and include a description of the steps taken to achieve the requirements. If the United States deems it appropriate, it may assist Settling Defendant, or take independent action, to obtain such access or use restrictions.

48. Notwithstanding any provision of the Decree, EPA and the State retain all of their access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions and Institutional Controls, including related enforcement authorities, under CERCLA, RCRA, and any other applicable statute or regulations.

## VIII. FINANCIAL ASSURANCE

49. To ensure completion of the Work required under Section VI, Settling Defendant shall secure financial assurance, initially in the amount of $125,000,000 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA and be satisfactory to EPA. As of the date of lodging of this Decree, the sample documents can be found under the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/. Settling Defendant may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, insurance policies, or some combination thereof. The following are acceptable mechanisms:

a. a surety bond guaranteeing payment, performance of the Work, or both, that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b. an irrevocable letter of credit, payable to EPA or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c. a trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency; or

d. a policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency.

e. a guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of a Settling Defendant or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a Settling Defendant; and (2) demonstrates to EPA's satisfaction that it meets the financial test criteria of ¶ 50.

50. If Settling Defendant seeks to provide financial assurance by means of a guarantee under ¶ 49.e it must, within 30 days after the Effective Date:

a. demonstrate that:

(1) Settling Defendant or the guarantor has:

i. two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii. net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii. tangible net worth of at least $10 million; and

iv. assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

(2) Settling Defendant or the guarantor has:

i. a current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

ii. tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii. tangible net worth of at least $10 million; and

iv. assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b. submit to EPA for Settling Defendant or the guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA. As of the date of lodging of this Decree, a sample letter and report is available under the "Financial Assurance" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

51. Settling Defendants providing financial assurance by means of a guarantee under ¶ 49.e must also:

a. annually resubmit the documents described in ¶ 50.b within 90 days after the close of Settling Defendant's or the guarantor's fiscal year;

b. notify EPA within 30 days after Settling Defendant or the guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c. provide to EPA, within 30 days of EPA's request, reports of the financial condition of Settling Defendant or the guarantor in addition to those specified in ¶ 50.b; EPA may make such a request at any time based on a belief that Settling Defendant or the guarantor may no longer meet the financial test requirements of this Section.

52. Settling Defendant shall, within 30 days after the Effective Date, seek EPA's approval of the form of Settling Defendant's financial assurance. Within 30 days after such approval, Settling Defendant shall secure all executed or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Regional Financial Management Officer, to DOJ, and to EPA.

53. Settling Defendant shall diligently monitor the adequacy of the financial assurance. If Settling Defendant becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Settling Defendant shall notify EPA of such information within seven days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify Settling Defendant of such determination. Settling Defendant shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the

requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for Settling Defendant, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. Settling Defendant shall follow the procedures of ¶ 55 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Settling Defendant's inability to secure financial assurance in accordance with this Section does not excuse performance of any other requirement of this Decree.

54. **Access to Financial Assurance**

a. If EPA issues a notice of a Work Takeover under ¶ 46.b, then, in accordance with any applicable financial assurance mechanism, EPA may require that any funds guaranteed be paid in accordance with ¶ 54.d.

b. If EPA is notified that the issuer of a financial assurance mechanism intends to cancel the mechanism, and Settling Defendant fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 54.d.

c. If, upon issuance of a notice of a Work Takeover under ¶ 46.b, EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to continue and complete the Work, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Defendant shall, within seven days after such demand, pay the amount demanded as directed by EPA.

d. Any amounts required to be paid under this ¶ 54 must be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the Fund or into the Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the Fund.

55. **Modification of Amount, Form, or Terms of Financial Assurance**. Beginning after the first anniversary of the Effective Date, and no more than once per calendar year, Settling Defendant may submit a request to change the form, terms, or amount of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 52, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Defendant of its decision regarding the request. Settling Defendant may initiate dispute resolution regarding EPA's decision. Settling Defendant may modify the form, terms, or amount of the financial assurance mechanism only: (a) in accordance with EPA's approval; or (b) in accordance with any resolution of a dispute under Section XII. Settling Defendant shall submit to EPA, within 30 days after receipt of EPA's

approval or consistent with the terms of the resolution of the dispute, documentation of the change to the form, terms, or amount of the financial assurance instrument.

56. **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Defendant may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.8 of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XII.

## IX. INDEMNIFICATION AND INSURANCE

57. **Indemnification**

a. Plaintiff does not assume any liability by entering into this Decree or by virtue of any designation of Settling Defendant as EPA's authorized representatives under section 104(e)(1) of CERCLA. Settling Defendant shall indemnify and save and hold harmless Plaintiff and its officials, agents, employees, contractors, subcontractors, and representatives for or from any claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on Settling Defendant's behalf or under its control, in carrying out activities under this Decree, including any claims arising from any designation of Settling Defendant as EPA's authorized representatives under section 104(e)(1) of CERCLA. Further, Settling Defendant shall pay Plaintiff all costs it incurs including attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against Plaintiff based on negligent or other wrongful acts or omissions of Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control in carrying out activities under with this Decree. Plaintiff may not be held out as a party to any contract entered into by or on behalf of Settling Defendant in carrying out activities under this Decree. Settling Defendant and any such contractor may not be considered an agent of Plaintiff.

b. Plaintiff shall give Settling Defendant notice of any claim for which such Plaintiff plans to seek indemnification in accordance with this ¶ 57, and shall consult with Settling Defendant prior to settling such claim.

58. Settling Defendant covenants not to sue and shall not assert any claim against Plaintiff for damages or reimbursement or for set-off of any payments made or to be made to Plaintiff, arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of Work or other activities on or relating to the Site, including claims on account of construction delays. In addition, Settling Defendant shall indemnify and save and hold Plaintiff harmless with respect to any claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of work at or relating to the Site, including claims on account of construction delays.

59. **Insurance**. Settling Defendant shall secure, by no later than 15 days before commencing any on-site Work, the following insurance: (a) commercial general liability insurance with limits of liability of $1 million per occurrence; (b) automobile liability insurance with limits of liability of $1 million per accident; and (c) umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits. The insurance policy must name Plaintiff as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Settling Defendant under this Decree. Settling Defendant shall maintain this insurance until the first anniversary after the issuance of EPA's Certification of Work Completion under ¶ 4.8 of the SOW. In addition, for the duration of this Decree, Settling Defendant shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendant in furtherance of this Decree. Prior to commencement of the Work, Settling Defendant shall provide to EPA certificates of such insurance and a copy of each insurance policy. Settling Defendant shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Settling Defendant demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendant needs to provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. Settling Defendant shall ensure that all submittals to EPA under this Paragraph identify the OU2 and OU4 of the Diamond Alkali Superfund Site and the civil action number of this case.

## X. PAYMENTS FOR RESPONSE COSTS

60. **Payments by Settling Defendant for Future Response Costs**

a. **Periodic Bills**. On a periodic basis, EPA will send Settling Defendant a bill for Future Response Costs including an "e-Recovery Report" listing direct costs paid by EPA and DOJ, and related indirect costs. Settling Defendant may initiate dispute resolution regarding a Future Response Cost billing, but only if the dispute relates to one or more of the following issues: (i) whether EPA has made an arithmetical error; (ii) whether EPA has included a cost item that is not within the definition of Future Response Costs; or (iii) whether EPA has paid excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Settling Defendant must specify in the Notice of Dispute the contested costs and the basis for the objection.

b. **Payment of Bill**. Settling Defendant shall pay the bill, or if it initiates dispute resolution, the uncontested portion of the bill, if any, within 30 days after receipt of the bill. Settling Defendant shall pay the contested portion of the bill determined to be owed, if any, within 30 days after the determination regarding the dispute. Each payment for: (i) the uncontested bill or portion of bill, if late, and; (ii) the contested portion of the bill determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the bill through the date of payment. Settling Defendant shall make payment at https://www.pay.gov using the "EPA Miscellaneous Payments Cincinnati Finance Center" link, and including references to the Site/Spill ID and DJ numbers listed in ¶ 100 and the purpose of the payment. Settling Defendant shall send notices of this payment to DOJ and EPA.

61. **Deposit of Payments**. EPA may, in its unreviewable discretion, deposit the amounts paid under ¶ 60.b in the Fund, in the Special Account, or both. EPA may, in its unreviewable discretion, retain and use any amounts deposited in the Special Account to conduct or finance response actions at or in connection with the Site, or transfer those amounts to the Fund.

## XI. FORCE MAJEURE

62. "Force majeure," for purposes of this Decree, means any event arising from causes beyond the control of Settling Defendant, of any entity controlled by them, or of its contractors that delays or prevents the performance of any Work despite Settling Defendant's best efforts. Given the need to protect public health and welfare and the environment, the requirement that Settling Defendant exercise "best efforts" to perform the Work includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that any adverse effects are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work.

63. **Claims of Force Majeure**

a. If any event occurs for which Settling Defendant will or may claim a force majeure, it shall notify EPA's Project Coordinator by email. The deadline for the notice is three days after Settling Defendant first knew or should have known that the event would likely delay or prevent performance. Settling Defendant is deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by Settling Defendant knew or should have known.

b. To assert a claim of force majeure Settling Defendant must submit, within seven days after the notice under ¶ 63.a, a further notice that includes: (1) a description of the event and its effect on the implementation of the Work; (2) a description of all actions taken or to be taken to minimize the adverse effects of the event; (3) a description of and an explanation for the requested excuse or extension; (4) a statement as to whether, in the opinion of Settling Defendant, the event may cause or contribute to an endangerment to public health or welfare or the environment; and (5) all available proof supporting the claim of force majeure.

c. Failure to submit timely or complete notices under ¶ 63.a or ¶ 63.b regarding an event precludes Settling Defendant from asserting a claim of force majeure regarding that event, provided, however, that EPA may, in its unreviewable discretion, excuse such failure, if it is able to assess to its satisfaction whether the event is a force majeure and whether Settling Defendant has exercised its best efforts under ¶ 62.

64. EPA will notify Settling Defendant of its determination whether it is entitled to relief under ¶ 62, and, if so, the excuse of or extension of time for performance of the portion of the Work affected by the force majeure. Any such excuse or extension does not, of itself, excuse or extend the time for performance of any other Work. Settling Defendant may initiate dispute resolution regarding EPA's determination. In any such proceeding, Settling Defendant has the

burden of proving that it is entitled to relief under ¶ 62 and that its proposed excuse or extension is warranted under the circumstances.

65. The failure by EPA to timely complete any activity under the Decree is not a violation of the Decree, provided, however, that if such failure prevents Settling Defendant from timely completing any Work, it may seek relief under this Section.

## XII. DISPUTE RESOLUTION

66. Unless otherwise provided in this Decree, Settling Defendant must use the dispute resolution procedures of this Section to resolve any dispute arising under this Decree. Settling Defendant shall not initiate a dispute challenging the OU2 ROD or OU4 ROD. The United States may enforce any requirement of the Decree that is not the subject of a pending dispute under this Section.

67. A dispute will be considered to have arisen when one or more parties sends a timely written notice of dispute ("Notice of Dispute"). A notice is timely if sent within 30 days after receipt of the EPA notice or determination giving rise to the dispute, or within 15 days in the case of a force majeure determination. Disputes arising under this Decree must in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations may not exceed 20 days after the dispute arises unless the parties to the dispute otherwise agree. If the parties cannot resolve the dispute by informal negotiations, the position advanced by EPA is binding unless Settling Defendant initiates formal dispute resolution under ¶ 68.

68. **Formal Dispute Resolution**

a. **Statements of Position**. Settling Defendant may initiate formal dispute resolution by serving on the Plaintiff, within 20 days after the conclusion of informal dispute resolution under ¶ 67, an initial Statement of Position regarding the matter in dispute. The Plaintiff's responsive statement of position is due within 20 days after receipt of the initial statement of position. All statements of position must include supporting factual data, analysis, opinion, and other documentation. A reply, if any, is due within 10 days after receipt of the response. If appropriate, EPA may extend the deadlines for filing statements of position for up to 45 days and may allow the submission of supplemental statements of position.

b. **Formal Decision**. An EPA management official at the level of the Deputy Director of the Superfund & Emergency Management Division, EPA Region 2, will issue a formal decision resolving the dispute ("Formal Decision") based on the statements of position and any replies and supplemental statements of position. The Formal Decision is binding on Settling Defendant unless it timely seeks judicial review under ¶ 69.

c. **Compilation of Administrative Record**. EPA shall compile an administrative record regarding the dispute, which must include all statements of position, replies, supplemental statements of position, and the Formal Decision.

69. **Judicial Review**

a. Settling Defendant may obtain judicial review of the Formal Decision by filing, within 20 days after receiving it, a motion with the Court and serving the motion on all Parties. The motion must describe the matter in dispute and the relief requested. The parties to the dispute shall brief the matter in accordance with local court rules.

b. **Review on the Administrative Record**. Judicial review of disputes regarding the following issues must be on the administrative record: (i) the adequacy or appropriateness of deliverables required under the Decree; (ii) the adequacy of the performance of the Work; (iii) whether a Work Takeover is warranted under ¶ 46; (iv) determinations about financial assurance under Section VIII; and (v) EPA's selection of modified or further response actions; (vi) any other items requiring EPA approval under the Decree; and (vii) any other disputes that the Court determines should be reviewed on the administrative record. For all of these disputes, Settling Defendant bears the burden of demonstrating that the Formal Decision was arbitrary and capricious or otherwise not in accordance with law.

c. Judicial review of any dispute not governed by ¶ 69.b is governed by applicable principles of law.

70. **Escrow Account**. For disputes regarding a Future Response Cost billing, Settling Defendant shall: (a) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the FDIC; (b) remit to that escrow account funds equal to the amount of the contested Future Response Costs; and (c) send to EPA copies of the correspondence and of the payment documentation (e.g., the check) that established and funded the escrow account, including the name of the bank, the bank account number, and a bank statement showing the initial balance in the account. EPA may, in its unreviewable discretion, waive the requirement to establish the escrow account. Settling Defendant shall cause the escrow agent to pay the amounts due to EPA under ¶ 60, if any, by the deadline for such payment in ¶ 60. Settling Defendant is responsible for any balance due under ¶ 60 after the payment by the escrow agent.

71. The initiation of dispute resolution procedures under this Section does not extend, postpone, or affect in any way any requirement of this Decree, except as EPA agrees, or as determined by the Court. Stipulated penalties with respect to the disputed matter will continue to accrue, but payment is stayed pending resolution of the dispute, as provided in ¶ 74.

## XIII. STIPULATED PENALTIES

72. Unless the noncompliance is excused under Section XI (Force Majeure), Settling Defendant is liable to the United States for the following stipulated penalties:

a. for any failure: (i) to pay any amount due under Section X (Payments for Response Costs); (ii) to establish and maintain financial assurance in accordance with Section VIII; (iii) to submit timely or adequate deliverables under Section 7 of the SOW; or (iv) to complete all other tasks or obligations required under Section 7 of the SOW:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $3,000 |
| 15th through 30th day | $5,000 |
| 31st day and beyond | $12,000 |

b. for any failure to submit timely or adequate deliverables required by this Decree other than those specified in ¶ 72.a:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $3,000 |
| 15th through 30th day | $5,000 |
| 31st day and beyond | $10,000 |

c. If the United States determines that any third party's delay or failure to comply with an access agreement, administrative order requiring access, or settlement agreement memorializing an agreement to provide access to which the United States is a party and for which it has enforcement authority, has solely caused a failure identified in 72.a. or 72.b., the United States will not assess stipulated penalties for that failure.

d. If the United States determines that PVSC's revocation of the Consent for Access to Properties dated February 10, 2026, has solely caused a failure identified in 72.a. or 72.b., the United States will not assess stipulated penalties for that failure.

73. **Work Takeover Penalty**. If EPA commences a Work Takeover, Settling Defendant is liable for a stipulated penalty in the amount of $30,000,000. This stipulated penalty is in addition to the remedy available to EPA under ¶ 54 (Access to Financial Assurance) to fund the performance of the Work by EPA.

74. **Accrual of Penalties**. Stipulated penalties accrue from the date performance is due, or the day a noncompliance occurs, whichever is applicable, until the date the requirement is completed or the final day of the correction of the noncompliance. Separate penalties may accrue simultaneously for separate noncompliances with this Decree. Stipulated penalties accrue regardless of whether Settling Defendant has been notified of its noncompliance, and regardless of whether Settling Defendant has initiated dispute resolution under Section XII, provided, however, that no penalties will accrue as follows:

a. with respect to a submission that EPA subsequently determines is deficient under ¶ 6.6 of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Defendant of any deficiency;

b. with respect to a deficient initial submission under ¶ 6.6(a) of the SOW if the deficiency is corrected in the resubmitted submittal under ¶ 6.6(b) of the SOW;

c. with respect to a matter that is the subject of dispute resolution under Section XII, during the period, if any, beginning on the 21st day after the later of the date that

EPA's Statement of Position is received or the date that Settling Defendant's reply thereto (if any) is received until the date of the Formal Decision under ¶ 68.b; or

d. with respect to a matter that is the subject of judicial review by the Court under ¶ 69, during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.

75. **Demand and Payment of Stipulated Penalties**. EPA may send Settling Defendant a demand for stipulated penalties. The demand will include a description of the noncompliance and will specify the amount of the stipulated penalties owed. Settling Defendant may initiate dispute resolution regarding the demand. Settling Defendant shall pay the amount demanded or, if it initiate dispute resolution, the uncontested portion of the amount demanded, within 30 days after receipt of the demand. Settling Defendant shall pay the contested portion of the penalties determined to be owed, if any, within 30 days after the resolution of the dispute. Each payment for: (a) the uncontested penalty demand or uncontested portion, if late; and (b) the contested portion of the penalty demand determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the demand through the date of payment. Settling Defendant shall make payment at https://www.pay.gov using the link for "EPA Miscellaneous Payments Cincinnati Finance Center," including references to the Site/Spill ID and DJ numbers listed in ¶ 100, and the purpose of the payment. Settling Defendant shall send a notice of this payment to DOJ and EPA. The payment of stipulated penalties and Interest, if any, does not alter any obligation by Settling Defendant under the Decree.

76. Nothing in this Decree limits the authority of the United States: (a) to seek any remedy otherwise provided by law for Settling Defendant's failure to pay stipulated penalties or interest; or (b) to seek any other remedies or sanctions available by virtue of Settling Defendant's noncompliance with this Decree or of the statutes and regulations upon which it is based, including penalties under section 122(*l*) of CERCLA, provided, however, that the United States may not seek civil penalties under section 122(*l*) of CERCLA for any noncompliance for which a stipulated penalty is provided for in this Decree, except in the case of a willful noncompliance with this Decree.

77. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued under this Decree.

## XIV. COVENANTS BY PLAINTIFF

78. **Covenants for Settling Defendant**. Subject to ¶ 80 and ¶ 92, the United States covenants not to sue or to take administrative action against Settling Defendant under sections 106 and 107(a) of CERCLA regarding (a) the Work and Future Response Costs or (b) response costs solely related to Existing Contamination.

79. The covenants under ¶ 78: (a) take effect upon the Effective Date, except with respect to future liability regarding Existing Contamination, for which these covenants take effect upon EPA's Certification of Work Completion (b) are conditioned on the satisfactory

performance by Settling Defendant of the requirements of this Decree; (c) extend to the successors of Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of the Settling Defendant; and (d) do not extend to any other person.

80. **General Reservations**. Notwithstanding any other provision of this Decree, the United States reserves, and this Decree is without prejudice to, all rights against Settling Defendant, regarding the following:

a. liability for failure by Settling Defendant to meet a requirement of this Decree;

b. liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c. liability based on Settling Defendant's ownership of the Site when such ownership commences after Settling Defendant's signature of this Decree;

d. liability based on Settling Defendant's operation of the Site when such operation commences after Settling Defendant's signature of this Decree and does not arise solely from Settling Defendant's performance of the Work;

e. liability based on Settling Defendant's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, after signature of this Decree by Settling Defendant, other than as provided in the OU2 ROD and OU4 ROD, under this Decree, or ordered by EPA;

f. liability for OU2 Remedial Action and/or OU4 Remedial Action that is not part of the Work, additional operable units at the Site, or the final response action;

g. liability, prior to issuance of the EPA's issuance of the Certification of Work Completion, for additional response actions that EPA determines are necessary to carry out and maintain the effectiveness of the OU2 Remedial Action and/or OU4 Remedial Action, but that are not covered by ¶ 44.b;

h. liability resulting from exacerbation by Settling Defendant, or its contractors, subcontractors, or representatives, of any Existing Contamination and

i. criminal liability.

81. With respect to any claim or cause of action asserted by the United States against Settling Defendant, Settling Defendant shall bear the burden of proving that the claim or cause of action, or any part thereof, is attributable solely to Existing Contamination.

82. Subject to ¶ 78, nothing in this Decree limits any authority of Plaintiff to take, direct, or order all appropriate action to protect public health and welfare and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or to request a Court to order such action.

## XV. PRIOR ADMINISTRATIVE ORDERS

83. EPA agrees to issue a notice of completion for the 2008 Tierra Removal ASAOC, subject to continuing obligations set forth in the 2008 Tierra Removal ASAOC under Section XI (Access to Information), Section XII (Record Retention), and Section XXV (Indemnification), within 30 days after the Effective Date.

84. EPA agrees to issue a notice of completion to the River Mile 10.9 Removal UAO, subject to continuing obligations set forth in the River Mile 10.9 Removal UAO, under Section XII (Access to Information and Property) and Section XIV (Record Retention), within 30 days after it issues a notice of completion for the River Mile 10.9 ASAOC.

## XVI. COVENANTS BY SETTLING DEFENDANT

85. **Covenants by Settling Defendant**

a. Subject to ¶ 86, Settling Defendant covenants not to sue and shall not assert any claim against the United States under CERCLA, section 7002(a) of RCRA, the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law regarding Existing Contamination, the Work and Future Response Costs.

b. Subject to ¶ 86, Settling Defendant covenant not to seek reimbursement from the Fund through CERCLA or any other law for costs regarding Existing Contamination, the Work and Future Response Costs.

86. **Settling Defendant's Reservation**. The covenants in ¶ 85 do not apply to any claim brought or order issued after the Effective Date by the United States to the extent such claim or order is within the scope of a reservation under ¶¶ 80.a through 80.g.

87. **Ability to Pay Waiver**. Settling Defendant shall not assert any claims and waive all claims or causes of action (including claims or causes of action under sections 107(a) and 113 of CERCLA) that it may have against any third party who enters or has entered into an "ability-to-pay" settlement with EPA to the extent Settling Defendant's claims and causes of action are within the scope of the matters addressed in the third party's settlement with EPA, provided, however, that this waiver does not apply if the third party asserts a claim regarding the Site against the Settling Defendant. Nothing in the Decree limits Settling Defendant's rights under section 122(d)(2) of CERCLA to comment on any ability-to-pay settlement proposed by EPA.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

88. The Parties agree and the Court finds that: (a) the complaint filed by the United States in this action is a civil action within the meaning of section 113(f)(1) of CERCLA; (b) this Decree constitutes a judicially approved settlement under which Settling Defendant has, as of the Effective Date, resolved its liability to the United States within the meaning of sections 113(f)(2) and 113(f)(3)(B) of CERCLA; and (c) Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "Matters Addressed" in this Decree. The

contribution protection under the preceding sentence extends to the successors of Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of the Settling Defendant. The Matters Addressed in this Decree are the (a) Work and Future Response Costs and (b) response costs solely related to Existing Contamination, provided, however, that if the United States bring a claim against Settling Defendant under a reservation in ¶¶ 80.a through 80.g, the Matters Addressed in this Decree do not include those response costs or response actions that are within the scope of the claim brought under the reservation.

89. Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Decree, notify DOJ and EPA no later than 60 days prior to the initiation of such suit or claim. Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Decree, notify DOJ and EPA within 10 days after service of the complaint on such Settling Defendant. In addition, Settling Defendant shall notify DOJ and EPA within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

90. **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated against Settling Defendant by Plaintiff for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case.

91. Nothing in this Decree diminishes the right of the United States under section 113(f)(2) and (3) of CERCLA to pursue any person not a party to this Decree to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to section 113(f)(2).

## XVIII. CERTIFICATION

92. By entering into this Consent Decree, Settling Defendant certifies that to the best of its knowledge and belief, it has requested all information that is in the possession of its agents, contractors or other representatives retained with respect to the PVSC Property and/or the PSE&G Harrison Property which relates in any way to any Existing Contamination, and has fully and accurately disclosed to EPA all such information and any other information known to Settling Defendant and all information in the possession or control of its officers, directors, and employees, including information received from its agents, contractors or other representatives, which relates in any way to any such Existing Contamination. Settling Defendant also certifies that to the best of its knowledge and belief, as of the date of signature of this Consent Decree by Settling Defendant, it has not caused or contributed to Existing Contamination at the PVSC Property and/or the PSE&G Harrison Property. If the United States concludes that Settling Defendant failed to fully and accurately disclose any of the above-referenced information to EPA, it may so notify Settling Defendant. Settling Defendant may invoke the procedures set forth in Section XII (Dispute Resolution) to dispute the United States' position. If, following completion of dispute resolution proceedings under Section XII (Dispute Resolution), Settling

Defendant is found to have failed to fully and accurately disclose to EPA material information which should have been disclosed to EPA under the first sentence of this Paragraph, the covenant not to sue contained in subparagraph 78(b), above, shall be null and void and the United States reserves all rights it may have regarding the Existing Contamination.

## XIX. RECORDS

93. **Settling Defendant Certification**. Settling Defendant certifies that: (a) to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any documents or electronically stored information (other than identical copies) relating to its potential liability under CERCLA regarding the Site, since the earlier of notification of potential liability by the United States or the State or the filing of suit against it regarding the Site; and (b) it has fully complied with any and all EPA requests for information under sections 104(e) and 122(e) of CERCLA, and section 3007 of RCRA.

94. **Retention of Records and Information**

a. Settling Defendant shall retain, and instruct its contractors and agents to retain, the following documents and electronically stored data ("Records") until 10 years after issuance of the Certification of Work Completion under SOW ¶ 4.8 (the "Record Retention Period"):

(1) All records regarding Settling Defendant's liability under CERCLA regarding the Site;

(2) All reports, plans, permits, and documents submitted to EPA in accordance with this Decree, including all underlying research and data; and

(3) All data developed by, or on behalf of, Settling Defendant in the course of performing the Work.

b. Settling Defendant shall retain all Records regarding the liability of any person under CERCLA regarding the Site during the Record Retention Period.

c. Settling Defendant shall maintain Records that were originally created in an electronic format in its native format or in a reasonably accessible format and shall keep them reasonably organized. Unmarked paper printouts of electronic records maintained in accordance with this paragraph will be considered duplicates or convenience copies and need not be preserved.

d. At the end of the Record Retention Period, Settling Defendant shall notify EPA that it has 90 days to request the Settling Defendant's Records subject to this Section. Settling Defendant shall retain and preserve its Records subject to this Section until 90 days after EPA's receipt of the notice. These record retention requirements apply regardless of any corporate record retention policy.

95. Settling Defendant shall provide to EPA, upon request, copies of all Records and information required to be retained under this Section. Settling Defendant shall also make available to EPA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

96. **Privileged and Protected Claims**

a. Settling Defendant may assert that all or part of a record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the record, provided that Settling Defendant comply with ¶ 96.b, and except as provided in ¶ 96.c.

b. If Settling Defendant asserts a claim of privilege or protection, it shall provide Plaintiff with the following information regarding such record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a record, Settling Defendant shall provide the record to Plaintiff in redacted form to mask the privileged or protected portion only. Settling Defendant shall retain all records that it claims to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Settling Defendant's favor.

c. Settling Defendant shall not make any claim of privilege or protection regarding: (1) any data regarding the Site, including all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other record that evidences conditions at or around the Site; or (2) the portion of any record that Settling Defendant is required to create or generate in accordance with this Decree.

97. **Confidential Business Information Claims**. Settling Defendant is entitled to claim that all or part of a record submitted to Plaintiff under this Section is Confidential Business Information ("CBI") that is covered by section 104(e)(7) of CERCLA and 40 C.F.R. § 2.203(b). Settling Defendant shall segregate all records or parts thereof submitted under this Decree which it claims are CBI and label them as "claimed as confidential business information" or "claimed as CBI." Records that Settling Defendant properly labels in accordance with the preceding sentence will be afforded the protections specified in 40 C.F.R. part 2, subpart B. If any record is not properly labelled when it is submitted to EPA and the State, or if EPA notifies Settling Defendant that the record is not entitled to confidential treatment under the standards of section 104(e)(7) of CERCLA or 40 C.F.R. part 2, subpart B, the public may be given access to such record without further notice to Settling Defendant.

98. In any proceeding under this Decree, validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA, if relevant to the proceeding, is admissible as evidence, without objection.

99. Notwithstanding any provision of this Decree, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX. NOTICES AND SUBMISSIONS

100. All agreements, approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, waivers, and requests specified in this Decree must be in an electronic writing unless otherwise specified. Whenever a notice is required to be given or a report or other document is required to be sent by one Party to another under this Decree, it must be sent via email as specified below, except such original financial assurance instruments submitted under Paragraph 52 that must be submitted as paper originals. All notices under this Section are effective upon receipt. There is a rebuttable presumption that emailed notices are received on the same day that they are sent. Any Party may change the person or email address applicable to it by providing notice of such change to all Parties.

| | |
|---|---|
| As to DOJ: | eescdcopy.enrd@usdoj.gov<br>Re: DJ #90-11-3-07683/20 |
| As to EPA: | Alice Yeh, Remedial Project Manager<br>yeh.alice@epa.gov<br>Re: Site/Spill ID # 0296<br><br>Kathryn DeLuca, Assistant Regional Counsel<br>deluca.kathryn@epa.gov<br>Re: Site/Spill ID # 0296 |
| As to the Regional Financial Management Officer (for hard copy financial assurance submissions): | *via regular mail to:*<br>Supervisor, Resource Management/Cost Recovery Section Superfund and Emergency Management Division<br>U.S. Environmental Protection Agency, Region 2<br>290 Broadway, 18th Floor<br>New York, NY 10007<br>Re: Site/Spill ID # 0296 |
| As to EPA Cincinnati Finance Center (for notices of payment): | *via email to:*<br>cinwd_acctsreceivable@epa.gov<br>Re: Site/Spill ID # 0296 |
| As to Settling Defendant: | Enrique Castro, PE<br>enrique_castro@oxy.com |

## XXI. APPENDIXES

101. The following appendixes are attached to and incorporated into this Decree:

"Appendix A" is the OU2 ROD (without attachments).

"Appendix B" is the OU4 ROD (without attachments).

"Appendix C" is the SOW.

"Appendix D" is the map of the Site.

## XXII. MODIFICATIONS TO DECREE

102. Except as provided in ¶ 44 of the Decree and ¶ 6.6 of the SOW (Approval of Deliverables), nonmaterial modifications to Sections I through XXVI and the Appendices must be in writing and are effective when signed (including electronically signed) by the Parties. Material modifications to Sections I through XXVI and the Appendices must be in writing, signed (which may include electronically signed) by the Parties, and are effective upon approval by the Court.

## XXIII. SIGNATORIES

103. The undersigned representative of the United States and the undersigned representative of a Settling Defendant certifies that they are fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

## XXIV. PRE-ENTRY PROVISIONS

104. If for any reason the Court should decline to approve this Decree in the form presented, this agreement, except for ¶ 105 and ¶ 106, is voidable at the sole discretion of any Party and its terms may not be used as evidence in any litigation between the Parties.

105. This Decree will be lodged with the Court for at least 30 days for public notice and comment in accordance with section 122(d)(2) of CERCLA and 28 C.F.R. § 50.7. The United States may withdraw or withhold its consent if the comments regarding the Decree disclose facts or considerations that indicate that the Decree is inappropriate, improper, or inadequate.

106. Settling Defendant agrees not to oppose or appeal the entry of this Decree.

## XXV. INTEGRATION

107. This Decree constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, regarding the subject matter of the Decree.

## XXVI. FINAL JUDGMENT

108. Upon entry of this Decree by the Court, this Decree constitutes a final judgment under Fed. R. Civ. P. 54 and 58 among the Parties.

SO **ORDERED** this ___ day of ___________, 20___.

_____________________________________

United States District Judge

Signature Page for Consent Decree in *U.S. v. Environmental Resource Holdings, LLC* (D.N.J.)

**FOR THE UNITED STATES:**

______________ ______________________________

Dated

**ADAM R.F. GUSTAFSON**
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

MYLES FLINT Digitally signed by MYLES FLINT
Date: 2026.09.10 12:21:23 -04'00'

______________________________

Myles E. Flint II
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 532-3377
Myles.Flint@usdoj.gov

Signature Page for Consent Decree in *U.S. v. Environmental Resource Holdings, LLC* (D.N.J.)

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

Pat Evangelista Digitally signed by Pat Evangelista Date: 2026.07.06 15:20:42 -04'00'

Pat Evangelista
Director
Superfund & Emergency Management Division
U.S. Environmental Protection Agency
Region 2
290 Broadway, 19th Floor
New York, NY 10007

KATHRYN DELUCA Digitally signed by KATHRYN DELUCA Date: 2026.07.06 07:43:43 -04'00'

Kathryn DeLuca
Assistant Regional Counsel
U.S. Environmental Protection Agency
Office of the Regional Counsel
2890 Woodbridge Avenue, B205 Bay A
Edison, New Jersey 08837

Signature Page for Consent Decree in *U.S. v. Environmental Resource Holdings, LLC* (D.N.J.)

**FOR**: Environmental Resource Holdings, LLC

DocuSigned by:
Robert Peterson
1190302D6608426...

6/30/2026

Dated

Name: Robert Peterson
Title: Manager
Address: 5 Greenway Plaza, Suite 110, Houston, TX 77046

If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court. **This Settling Defendant hereby designates the agent below to execute the Rule 4 waiver of service.** This Settling Defendant understands that: (i) it does not need to file an answer to the complaint until after it has executed the waiver of service or otherwise has been served with the complaint; and (ii) the time within which this Defendant must file its answer is as set forth in the Federal Rules of Civil Procedure and any applicable local rules of this Court, or as ordered by the Court.

Name: Robert Peterson
Title: Manager
Company: Environmental Resource Holdings, LLC
Address: 5 Greenway Plaza, Suite 110
Houston, TX 77046
Phone: (713) 215-7000
email: Robert_Peterson@oxy.com